IN THE SUPREME COURT OF NORTH CAROLINA

 2021-NCSC-154

 No. 378A20

 Filed 17 December 2021

 IN THE MATTER OF: N.B.

 Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from orders entered on 5 May

 2020 by Judge Hal Harrison in District Court, Madison County. This matter was

 calendared in the Supreme Court on 12 November 2021 but determined on the record

 and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules

 of Appellate Procedure.

 Law Offices of Jamie A. Stokes, PLLC, by Jamie A. Stokes, for petitioner-
 appellee Madison County Department of Social Services.

 Sophie Goodman for appellee Guardian ad Litem.

 Peter Wood for respondent-appellant mother.

 EARLS, Justice.

¶1 Respondent, the mother of the juvenile N.B. (Nancy),1 appeals from the trial

 court’s order terminating her parental rights. She argues that the trial court abused

 its discretion by concluding that termination was in Nancy’s best interests. In

 particular, respondent points to evidence in the record that she had a bond with her

 child and challenges the trial court’s findings to the contrary. However, the trial

 1 A pseudonym is used in this opinion to protect the juvenile’s identity and for ease of

 reading.
 IN RE N.B.

 2021-NCSC-154

 Opinion of the Court

 court’s findings were supported by the evidence. Further, in making its determination

 that termination of respondent’s parental rights was in Nancy’s best interests, the

 trial court considered the applicable statutory criteria and made written findings

 concerning the relevant factors. The court’s ultimate decision is supported by reason

 and not an abuse of discretion. As a result, we affirm the trial court’s order.

 I. Background

¶2 On 17 June 2019, Madison County Department of Social Services (DSS) filed

 a petition alleging that Nancy, who was seven years old at the time, was a neglected

 juvenile. DSS alleged it had received four reports between February and June 2019,

 three of which followed Nancy’s disclosure to educators that she felt unsafe in her

 home due to abuse by respondent’s boyfriend and respondent’s substance abuse and

 self-harm. Nancy also disclosed that she had thought about suicide and had a plan

 for accomplishing it. DSS discovered that one of respondent’s boyfriends, Todd, had

 an extensive criminal history, and DSS established a safety plan with respondent to

 prevent Todd from having contact with Nancy. Respondent violated this safety plan

 numerous times and continued to have contact with Todd, even though he had stated

 he wanted to “kill children,” and respondent believed he was a danger to Nancy.

 Nancy further disclosed that respondent had instructed her to lie to DSS. DSS

 obtained nonsecure custody of Nancy the same day the petition was filed and placed

 her in foster care.
 IN RE N.B.

 2021-NCSC-154

 Opinion of the Court

¶3 On 1 July 2019, DSS filed an amended petition alleging that Nancy was a

 neglected and dependent juvenile. The amended petition detailed respondent’s

 extensive history with DSS, beginning when Nancy’s half-siblings were removed from

 respondent’s care in February 2009 due to domestic violence and substance abuse.

 DSS became involved with Nancy at her birth in April 2012 after she tested positive

 for marijuana and respondent tested positive for benzodiazepines. In addition, the

 petition alleged respondent had been arrested and charged with multiple drug

 offenses on 15 June 2019. She submitted to a drug screen, which was positive for

 oxycodone and opiates, and she admitted to methamphetamine use several days

 prior. DSS obtained a hair follicle test for Nancy, which revealed dangerously high

 levels of methamphetamine and amphetamines. The petition also alleged that

 Nancy’s father was deceased, that respondent lacked the ability to care for Nancy on

 her own, and that respondent had no appropriate alternative childcare arrangement.

¶4 Following a hearing on 1 July 2019, the trial court adjudicated Nancy to be a

 neglected and dependent juvenile. As an interim disposition, the court required

 respondent to produce two consecutive negative drug screens before exercising

 visitation with Nancy.

¶5 The trial court held a combined disposition and permanency-planning hearing

 on 12 August 2019. In its resulting order, the court found that seventeen reports were

 made to DSS since Nancy’s birth and that Nancy had “been surrounded by domestic
 IN RE N.B.

 2021-NCSC-154

 Opinion of the Court

 violence, drug use, and instability her whole life.” Respondent admitted to having

 methamphetamine in her possession when DSS took custody of Nancy, and Nancy’s

 hair follicle test was positive for methamphetamine in her system. Respondent

 acknowledged she had previously witnessed Nancy hallucinating. The court further

 found that respondent had started attending substance abuse classes, though the

 court also noted that this was the third time she had done so. Respondent had not

 visited with Nancy since the adjudication as she failed to produce two negative drug

 screens; she instead tested positive three times.

¶6 The trial court found that aggravated circumstances existed pursuant to

 N.C.G.S. § 7B-901(c)(1)(b) and (e) (2019) and relieved DSS from making efforts

 toward reunification. The court determined a permanent plan of adoption with a

 concurrent plan of guardianship was in Nancy’s best interests. As a necessary

 precondition of visitation, respondent was required to produce negative drug screens

 for six consecutive weeks; if she complied with this precondition, respondent would

 be permitted visitation, provided visitation was also recommended by Nancy’s

 therapist. Respondent did not appeal the adjudication and disposition orders.

¶7 By the December 2019 permanency-planning hearing, respondent had made

 some progress on her case plan. She produced six negative drug screens. Based on

 this progress, she requested visitation with Nancy. However, Nancy’s therapist

 recommended against allowing visitation, and the trial court refused respondent’s
 IN RE N.B.

 2021-NCSC-154

 Opinion of the Court

 request. The trial court maintained Nancy’s permanent plan as “adoption concurrent

 with guardianship.”

¶8 On 2 December 2019, DSS filed a petition to terminate respondent’s parental

 rights on the grounds of abuse, neglect, and dependency. See N.C.G.S. § 7B-

 1111(a)(1)–(2) (2019). Following a hearing, the court entered an order on 5 May 2020

 that found the grounds as alleged in the petition and determined it to be in Nancy’s

 best interests to terminate respondent’s parental rights. Respondent appeals.

 II. Best-interests determination

¶9 The termination of parental rights proceeds in two stages. First, the trial court

 adjudicates the existence of any alleged grounds for termination under N.C.G.S. § 7B-

 1111 (2019). See N.C.G.S. § 7B-1109 (2019). The petitioner must prove by clear and

 convincing evidence that one or more grounds for termination exist. In re A.U.D., 373

 N.C. 3, 5–6 (2019). If the trial court determines that at least one ground has been

 established, the case proceeds to the dispositional stage, where the court

 “determine[s] whether terminating the parent’s rights is in the juvenile’s best

 interest.” N.C.G.S. § 7B-1110(a) (2019).

¶ 10 Here, the trial court adjudicated grounds to terminate respondent’s parental

 rights on the basis of abuse and neglect under N.C.G.S. § 7B-1111(a)(1) and

 dependency under N.C.G.S. § 7B-1111(a)(6). Respondent concedes that the trial court

 “properly found grounds to terminate [her] parental rights.” Accordingly, our review
 IN RE N.B.

 2021-NCSC-154

 Opinion of the Court

 of the termination order is limited to determining whether the trial court properly

 concluded that termination of respondent’s parental rights was in Nancy’s best

 interests.

¶ 11 Under N.C.G.S. § 7B-1110, when the trial court determines whether

 termination of parental rights is in a juvenile’s best interests, the court

 shall consider the following criteria and make written
 findings regarding the following that are relevant:

 (1) The age of the juvenile.

 (2) The likelihood of adoption of the juvenile.

 (3) Whether the termination of parental rights will aid
 in the accomplishment of the permanent plan for the
 juvenile.

 (4) The bond between the juvenile and the parent.

 (5) The quality of the relationship between the juvenile
 and the proposed adoptive parent, guardian,
 custodian, or other permanent placement.

 (6) Any relevant consideration.

 N.C.G.S. § 7B-1110(a) (2019). The court’s dispositional findings are binding on appeal

 if supported by the record evidence. In re K.N.K., 374 N.C. 50, 57 (2020). By statute,

 “[t]he court may consider any evidence, including hearsay evidence as defined in

 [N.C.]G.S. 8C-1, Rule 801, that the court finds to be relevant, reliable, and necessary

 to determine the best interests of the juvenile.” N.C.G.S. § 7B-1110(a). The trial

 court’s ultimate determination regarding the child’s best interests is reviewed for
 IN RE N.B.

 2021-NCSC-154

 Opinion of the Court

 abuse of discretion and will be reversed only if it is “manifestly unsupported by reason

 or is so arbitrary that it could not have been the result of a reasoned decision.” In re

 T.L.H., 368 N.C. 101, 107 (2015).

 A. Challenges to the trial court’s findings of fact

¶ 12 Respondent first challenges dispositional findings of fact 44 and 45, which

 state:

 44. The minor child does not have a strong bond with the
 respondent mother. They have not visited since June of
 2019 due to prior orders requiring the respondent mother
 to provide clean drug screens and due to the
 recommendations of Dr. Huneycutt. At this time, future
 interaction between the juvenile and the respondent
 mother could trigger the juvenile, and the juvenile would
 require significant safety and stability measures before
 any such contact should occur.

 45. While the juvenile has asked when she will see the
 respondent mother, she has not requested to see the
 respondent mother and most of her inquiries regarding the
 respondent mother indicate that she has established a
 parentified role with the respondent mother. The minor
 child primarily inquires about her animals when asking
 about the respondent mother.

 The record contains ample evidence supporting both findings. Nancy began

 therapeutic services in August 2019, and her psychologist, Dr. Dominique Huneycutt,

 noted that she presented with a history of “significant emotional and behavioral

 difficulties,” including diagnoses of post-traumatic stress disorder, oppositional

 defiant disorder, and attention deficit hyperactivity disorder. Nancy had previously
 IN RE N.B.

 2021-NCSC-154

 Opinion of the Court

 engaged in self-harming behavior, exhibited physical and verbal aggression, and

 acknowledged prior suicidal ideation and planning.

¶ 13 Respondent attended visitations with Nancy for a short period of time after

 Nancy was removed from respondent’s care in June 2019, but respondent was denied

 visitation following the initial adjudication hearing due to her inability to produce

 two consecutive negative drug screens. Nancy’s behavior worsened during the time

 respondent had visitations with her. Nancy was reportedly “on edge” on the days

 when she would visit with respondent, to the point that she pulled her hair out. She

 also exhibited behavioral problems in her foster home, including excessive cursing,

 hitting, screaming, biting, and defiance, for approximately two days following a visit.

 Nancy also assumed a parental role towards respondent, attempting to moderate her

 disclosures to DSS in order to protect respondent and requesting DSS to check on

 respondent because she “needed to make sure [respondent] was okay.” However,

 Nancy never indicated to her social worker a desire to see respondent. Dr. Huneycutt

 recommended visitation with respondent not resume until Nancy was able to safely

 process her trauma.

¶ 14 At the termination hearing, Dr. Huneycutt reiterated that Nancy was “a

 seriously, emotionally disturbed child, [with] severe behaviors and safety risks,” and

 “any additional environment[al] chaos or substance exposure and damage would

 further set her back and exacerbate conditions.” Dr. Huneycutt advised the court that
 IN RE N.B.

 2021-NCSC-154

 Opinion of the Court

Nancy would need extensive support and stability, including intensive therapeutic

supports; future evaluations; high levels of consistency, structure, safety, and

responsiveness; intensive safety precautions; possible medical-neurological

interventions; structured activities; peer skills; social interaction skills; safety skills;

very high level of services with skilled professionals; and “a very stable environment

for a very long time.” Dr. Huneycutt acknowledged Nancy did occasionally say she

missed respondent and that she wanted to go back to her mother, but as she further

explained:

 [m]ost commonly [Nancy’s] statements will—she asks
 about her animals, and she makes statements like, “I need
 to see my mother.” And when you explore it, she’s worried
 about her mother. She’s worried about whether she’s okay.
 . . . And she doesn’t bring her mother up a lot. She brings
 up her biological father. She brings up [respondent’s
 boyfriends]. She talks about her animals. But she’s, “I’m
 the warrior. I killed the bear. I need to be with my mother.”
 And she’s describing protective roles. Her play reflects
 protective roles. So she does—and yes, she talks about her
 mom.

Thus, evidence in the record showed that Nancy had not had any contact with

respondent since June 2019, that Nancy had not asked the social worker to see

respondent, that Nancy would have to work through her past trauma before she could

resume visits with respondent, and that Nancy discussed her feelings towards

respondent during therapy in a protective or parental role and in the context of her

animals. Based on this evidence, the trial court reasonably determined that Nancy
 IN RE N.B.

 2021-NCSC-154

 Opinion of the Court

 and respondent did not have a strong or healthy bond. See In re D.L.W., 368 N.C. 835,

 843 (2016) (stating that it is the trial judge’s duty to consider all the evidence, pass

 upon the credibility of the witnesses, and determine the reasonable inferences to be

 drawn therefrom). Findings of fact 44 and 45 are supported by relevant and reliable

 evidence.

 B. Challenges to the trial court’s best-interests determination

¶ 15 Respondent also challenges findings of fact 46 and 48, which state:

 46. Given the juvenile’s diagnoses and Dr. Huneycutt’s
 opinion that she is a seriously emotionally disturbed child,
 the juvenile is in high need of stability and permanence
 and it is not in the best interest of the juvenile to further
 postpone her permanence.

 ....

 48. In light of the findings above, it is in the best interest
 of the juvenile [Nancy] that the [c]ourt terminate the
 parental rights of the respondent mother . . . to said
 juvenile.

 These findings are not factual in nature but instead address the ultimate question of

 Nancy’s best interests. We thus consider respondent’s challenges to them as such. See

 In re A.S.T., 375 N.C. 547, 555 (2020) (“Although the trial court labeled these

 conclusions of law as findings of fact, findings of fact which are essentially conclusions

 of law will be treated as such on appeal.” (cleaned up)). Respondent relatedly

 challenges the trial court’s conclusion of law 7, which also reflects its ultimate

 determination that termination of respondent’s parental rights was in Nancy’s best
 IN RE N.B.

 2021-NCSC-154

 Opinion of the Court

 interests.

 1. The trial court’s consideration of respondent’s bond with Nancy

¶ 16 Respondent first argues that the trial court abused its discretion because the

 court failed to consider her tenuous bond with Nancy in the proper context. She

 argues that her lack of opportunity to visit with Nancy, which she attributes to the

 trial court having “fast tracked the case, moving full speed ahead from the initial

 underlying petition to termination in eight months,” prevented the court from having

 the time needed to adequately assess their relationship. Respondent asserts that

 “[n]ot enough time had passed to evaluate whether the trial court should have

 terminated parental rights,” and that with additional time she would have been able

 to meet the necessary criteria to resume her visits with Nancy and strengthen the

 bond between them.

¶ 17 Initially, we note that the trial court acted in accordance with the Juvenile

 Code throughout this case. The “fast track[ing]” that respondent refers to occurred

 because the trial court determined in its initial disposition and permanency-planning

 order that the case fit within the aggravated circumstances of N.C.G.S. § 7B-

 901(c)(1)(b) and (c)(1)(e). Based on this determination, the court relieved DSS from

 making any further efforts toward reunification, as permitted by that statute. The

 order specifically found that respondent “has committed, encouraged, and allowed the

 continuation of chronic physical or emotional abuse of the juvenile, and chronic and
 IN RE N.B.

 2021-NCSC-154

 Opinion of the Court

 toxic exposure to controlled substances that causes the impairment of the juvenile.”

 Respondent did not appeal the trial court’s order, and she is therefore bound by its

 findings and conclusions. See In re A.S.M.R., 375 N.C. 539, 544 (2020).

¶ 18 Respondent argues that this case is analogous to various other termination

 cases, all of which addressed whether there were grounds for termination in the first

 place and not whether termination was in the child’s best interest. She relies on In re

 Young, 346 N.C. 244, 252 (1997), in which this Court held that there was insufficient

 evidence that the parent willfully abandoned her child when she was prevented from

 seeing the child; In re Shermer, 156 N.C. App. 281, 288 (2003), in which the Court of

 Appeals held that the parent was not given adequate time to make progress on the

 conditions which led to his child’s removal after the parent was released from prison;

 In re N.D.A., 373 N.C. 71, 78–79 (2019), in which this Court vacated and remanded a

 termination order in part because the trial court’s findings failed to resolve whether

 the parent’s actions and omissions which constituted abandonment of his child were

 willful; and In re I.R.L., 263 N.C. App. 481, 483 (2019), in which the Court of Appeals

 vacated and remanded a termination order with insufficient findings regarding

 willfulness when the parent was subject to a domestic violence protective order that

 forbid contact with the child’s mother.

¶ 19 These cases turned on the question of whether there were sufficient evidence

 and findings of fact with respect to parental fault to justify the trial court’s conclusion
 IN RE N.B.

 2021-NCSC-154

 Opinion of the Court

 that grounds existed to terminate a parent’s parental rights. Here, respondent does

 not dispute that the trial court properly adjudicated multiple grounds for

 termination. None of the precedents respondent invokes stand for the proposition

 that, having concluded that grounds exist which permit termination of parental

 rights, the trial court must nevertheless delay its best-interests determination.

¶ 20 The focus at the dispositional stage of a termination hearing is whether

 termination is in the best interests of the child. See N.C.G.S. § 7B-1110(a).

 [A]lthough parents have a constitutionally protected
 interest in the care and custody of their children and
 should not be unnecessarily or inappropriately separated
 from their children, “the best interests of the juvenile are
 of paramount consideration by the court and . . . when it is
 not in the juvenile’s best interest to be returned home, the
 juvenile will be placed in a safe, permanent home within a
 reasonable amount of time.” N.C.G.S. § 7B-100(5).

 In re A.U.D., 373 N.C. 3, 11–12 (2019).

¶ 21 Respondent does not cite any evidence in the record suggesting Nancy’s best

 interests would have been served by delaying the termination hearing. Dr.

 Hunneycutt testified that, at the time the termination hearing occurred, any

 interaction with respondent “could be triggering for [Nancy],” and that before

 respondent’s visitation with Nancy could resume “a lot of things . . . would have to

 happen.” Among the many things that “would have to happen,” Nancy “would need

 to be in a stable placement, need to be stable at school, and we would at least need to

 have fairly good safety for her in order to not overwhelm her.” There was no evidence
 IN RE N.B.

 2021-NCSC-154

 Opinion of the Court

 presented by respondent or by any other party regarding how long it might take

 before respondent and Nancy made sufficient progress such that visitation could

 resume or regarding how long it might further take to allow respondent sufficient

 visitation to improve her bond with Nancy.

¶ 22 We also note that respondent’s proposed delay relates to only one of the best

 interests factors: the parent-child bond. Even if respondent’s bond with Nancy was

 strong and positive, “the bond between parent and child is just one of the factors to

 be considered under N.C.G.S. § 7B-1110(a), and the trial court is permitted to give

 greater weight to other factors.” In re Z.L.W., 372 N.C. 432, 437 (2019).

¶ 23 Ultimately, the trial court was presented with relevant and reliable evidence

 regarding the bond between respondent and Nancy as it existed at the time of the

 termination hearing, and it properly made findings based on that evidence. Of course,

 the trial court possessed the discretion to conclude, based upon its assessment of the

 relevant dispositional factors, that it was in Nancy’s best interests not to terminate

 respondent’s parental rights even after concluding that multiple grounds for

 termination existed. But respondent’s argument that as a matter of law she was

 entitled to a delay in order to potentially improve her bond with Nancy is not

 supported by case law, by the evidence presented at the termination hearing, or by

 the Juvenile Code. The trial court did not err by moving forward with its best-

 interests determination after it concluded that grounds existed to terminate
 IN RE N.B.

 2021-NCSC-154

 Opinion of the Court

 respondent’s rights.

 2. The trial court’s weighing of the dispositional factors

¶ 24 The trial court’s order reflects that it considered all the required statutory

 criteria when it decided that termination of respondent’s parental rights would be in

 Nancy’s best interests. In addition to the findings already discussed, the court made

 uncontested findings that termination of respondent’s parental rights would assist

 “in achieving permanency for [Nancy] and would eliminate [the] barrier to

 implementing” the permanent plan of adoption, which also supports the finding that

 Nancy was “in high need of stability and permanence.” The court also found that

 Nancy was in a pre-adoptive placement and had a good relationship with her foster

 family. As in similar cases upheld by this Court, “the trial court’s findings in this case

 show that it considered the dispositional factors in N.C.G.S. § 7B-1110(a) and

 performed a reasoned analysis weighing those factors.” In re Z.A.M., 374 N.C. 88, 101

 (2020). We thus have no basis to reweigh these factors. See In re A.U.D., 373 N.C. at

 12 (“[T]his Court lacks the authority to reweigh the evidence that was before the trial

 court.”).

 3. The trial court’s failure to consider other dispositional alternatives

¶ 25 Lastly, respondent argues that “the trial court abused [its] discretion by not

 recognizing that continued visitation was still in the best interests of Nancy.”

 Respondent contends the court should have considered other dispositional
 IN RE N.B.

 2021-NCSC-154

 Opinion of the Court

 alternatives instead of termination to provide an avenue by which Nancy could

 maintain a relationship with her mother.

¶ 26 We have previously observed that

 this Court has rejected arguments that the trial court
 commits error at the dispositional stage of a termination of
 parental rights proceeding by failing to explicitly consider
 non-termination-related dispositional alternatives, such as
 awarding custody of or guardianship over the child to the
 foster family, by reiterating that “the paramount
 consideration must always be the best interests of the
 child.”

 In re N.K., 375 N.C. 805, 820 (2020) (quoting In re J.J.B., 374 N.C. 787, 795 (2020)).

 Here, there was no evidence presented at the dispositional hearing that an

 alternative disposition was available or preferrable to the termination of respondent’s

 parental rights, and the evidence that was presented did not establish that Nancy’s

 best interests would be served by maintaining a relationship with respondent.

 Instead, as stated above, the evidence indicated that contact with respondent

 impeded Nancy’s progress and resulted in increased negative behaviors. The trial

 court found that Nancy will require “intense intervention,” including “high levels of

 consistency; structure and safety; . . . a stable environment; and a high level of care

 for a very long time,” which was best accommodated through the termination of

 respondent’s parental rights. This determination was neither manifestly

 unsupported by reason nor so arbitrary that it could not have been the result of a

 reasoned decision.
 IN RE N.B.

 2021-NCSC-154

 Opinion of the Court

 III. Conclusion

¶ 27 The trial court did not abuse its discretion in concluding that termination of

 respondent’s parental rights was in Nancy’s best interests. Accordingly, we affirm the

 trial court’s order terminating respondent’s parental rights.

 AFFIRMED.